PER CURIAM.
These appeals are from a judgment awarding interpleaded funds to Orix Credit Alliance, Inc. (“Orix”); holding for Orix on the cross-claim filed by Forestry Equipment Company of Alabama, Inc. (“Forestry”); and holding that AmSouth Bank, N.A. (“AmSouth”), is not entitled to any share of the interpleaded funds. The issues are whether the trial court erred in refusing to reform certain financing documents because of a mistake of one party of which the other should have been aware or in holding the financing documents to be unambiguous.[1]
Forestry, founded in 1949 by Jack Hale and Charles Hale, was in the business of selling heavy equipment (e.g., tractors, logging skidders, trailers, etc.). For approximately 20 years before the dispute at issue here, Orix provided financing to buyers of Forestry equipment, often on a “recourse” basis, i.e., if the buyer defaulted, Forestry was obligated to repurchase the note from Orix.
In “recourse” cases, Forestry, on behalf of Orix, would repossess the equipment, resell it, and apply the proceeds toward the balance due Orix. Forestry would give Orix a security interest in the repossessed equipment, secured only by the equipment itself. As evidence of this arrangement, Forestry would execute a UCC-1 financing statement in favor of Orix and attach a “letter of trust” confirming Orix’s title to the repossessed equipment and Forestry’s possession of the equipment for Orix’s benefit. No “security agreement” document was executed as part of this arrangement or attached to or made part of the financing statement.
The financing statement generally used contained the following language:
“4. This financing statement covers the following types (or items) of property: All goods, inventory and equipment described in security agreements), trust letter(s) and/or schedule(s) annexed thereto between debtor and secured party. This filing is made for notification 'purposes only, as debtor is a bailee of goods, inventory and equipment for secured party and title to and ownership of the goods, inventory and equipment is and shall remain vested in secured party.”
(Emphasis added.)
The trial judge heard testimony from all witnesses that, until the documents in issue here were executed, the Orix financing documents covered only specified pieces of equipment and that the equipment itself was the only security for the debt. This practice was further documented by numerous exhibits, each consisting of a UCC-1 financing statement in favor of Orix (or its predecessor, Credit Alliance Corporation) and the attached “letter of trust.”
In the summer of 1988, Forestry was unable to resell two pieces of repossessed equipment, a logging skidder and a loader mounted on a large truck. The witnesses gave conflicting testimony regarding the further financing of this equipment.
Jean DeGrave, Orix’s collections manager since 1985, testified that, so far as he *1352 knew, the skidder and the loader were the first two pieces of repossessed equipment that Forestry had not been able to resell. DeGrave stated that he discussed the problem with Harold Hester, Forestry’s general manager from 1983 to October 1989, and that he told Hester that the note would have to be refinanced by Orix because the entire balance of the debt was due. De-Grave testified that he then mailed to Forestry, at Hester’s request, the necessary documents for Forestry to execute: a UCC-1 financing statement, a security agreement, a “Consent of Stockholders” form, and a “Secretary’s Certificate” form to show authorization by Forestry’s directors of the refinancing.
The UCC-1 financing statement sent to Forestry by DeGrave contained language that differed from that of previous financing statements:
“4. This financing statement covers the following types (or items) of property: All machinery, inventory, equipment, goods and accounts receivable as described in attached entire agreement and/or in any schedule prepared in connection therewith. This UCC form together with the attached security agreement and/or schedule are being submitted for filing herewith as a financing statement."
(Emphasis added.)
Attached to the financing statement was a “Schedule A,” specifically listing the skidder and loader, and a “Security Agreement — Mortgage on Goods and Chattels.” The first paragraph of the security agreement reads:
“1. To secure the payment with interest thereon and the performance and fulfillment of any and all Mortgage Obligations (as hereinafter defined) of Mortgagor [Forestry] to Mortgagee [Orix] which is hereby confessed and acknowledged. Mortgagor hereby grants, assigns, transfers, bargains, sells, conveys, confirms, pledges and mortgages to Mortgagee, all and singular, the goods, chattels and property described in the annexed Schedule A and all other goods, chattels, machinery, equipment, inventory, accounts, chattel paper, notes receivable, accounts receivable, furniture, fixtures and property of every kind and nature wherever located, now or hereafter belonging to Mortgagor ... to have and to hold the same unto Mortgagee forever. PROVIDED, however, that if Mortgagor shall fully, timely and faithfully pay, perform and fulfill the Mortgage Obligations, ... this Mortgage shall be void, but .otherwise shall remain in full force and effect.”
(Emphasis added.)
These documents were introduced into evidence, along with the executed “Secretary’s Certificate” and “Consent of Stockholders” forms giving the consent of Forestry’s directors and shareholders, Jack Hale and Charles Hale, to enter into the financing arrangement in issue here. All of these documents bear the signatures of Jack Hale, president of Forestry, and Charles Hale, secretary and vice-president; and the signatures are attested to by a notary public. Jack Hale and Charles Hale testified that, while the signatures appear to be theirs, they could not remember signing the documents in issue here. The UCC-1 financing statement and the attached “Schedule A” and “Security Agreement” were filed with the secretary of state of Alabama on September 12, 1988.[2]
Contrary to the testimony of DeGrave, Jack Hale and Charles Hale testified that, during the span of Forestry’s financial dealings with Orix, there had been other instances of Forestry’s inability to resell encumbered and repossessed equipment:
“Q. Now, in the event that you were not able to market the equipment within that 90 to 120 days and thereby pay off *1353 the note [to Orix], what procedure, if any, had you worked out with Mr. Clem-ente and Mr. Holman [Orix employees] in that regard?
“A. [Jack Hale] It would be put on a note and with a UCC-1 form signed for that particular item in question that had not been paid off alone.”
“Q. All right. In the event you couldn’t sell it after 90 to 120 days, what would happen? Suppose you didn’t find a third party to buy it, well, did you have any agreement about what happened then?
“A. [Charles Hale] I think they would extend it over or we’d put it on a different type note, I don’t — I’m not sure I know one note from another, but I should, I think they put it on a different type of agreement and note, but they would carry it.”
In November 1989, it was discovered that Forestry was in financial trouble and that Hester had sold some of the equipment specifically pledged to Orix without paying Orix from the proceeds of the sales. Orix sued Forestry in a federal court for the “out of trust” sales and in December 1990 obtained a judgment of $144,252.58.
In January 1990, Forestry gave AmSouth a security interest in all of Forestry’s equipment as security for a debt to Am-South in excess of $300,000. AmSouth perfected its security interest on February 6, 1990, by filing with the secretary of state a financing statement covering “all accounts, inventory, general intangibles and equipment of [Forestry].” Forestry maintains that it thought AmSouth’s security interest had priority over all other claims to Forestry assets.
On April 26,1991, all of Forestry’s assets were sold at auction for $62,771.14. Orix claimed the proceeds on two grounds: 1) that the amount of Orix’s federal court judgment against Forestry exceeded the auction proceeds, and 2) that Orix had priority over all other claims to Forestry assets, because of Orix’s perfected security agreement containing the omnibus clause. AmSouth claimed the auction proceeds pursuant to its January 1990 perfected security agreement.
Counsel for Forestry, as stakeholder of the auction proceeds, filed in the Mobile Circuit Court a “Bill To Interplead Funds,” acknowledging the conflicting claims to the money and asking the court to distribute the proceeds of the auction of Forestry’s assets. The named defendants in this action were Orix, AmSouth, and Forestry. Orix answered and set out, as the basis for its claim on the money, the security agreement and the prior federal court judgment against Forestry and in favor of Orix for an amount exceeding the auction proceeds.
Forestry filed an answer and a “Cross And Third-Party Complaint,”[3] in which it alleged that it had executed the security agreement with the intention of granting Orix a security interest only in the two specific pieces of machinery listed on Schedule A, not in the entire assets of Forestry. Forestry also alleged that, when the security agreement was executed, Orix knew that Forestry was under a mistaken belief that the two specific pieces of equipment were the only collateral for the agreement, and that Orix either- mistakenly or intentionally misrepresented facts to Forestry. Then, says Forestry, relying on those facts it executed the security agreement under a mistaken belief as to the identity of the collateral for the agreement. Forestry’s cross-claim also asked for money damages for the alleged fraud committed by Orix and for reformation of the security agreement to reflect Forestry’s true intention that the two “Schedule A” pieces of machinery were to be the only collateral for the debt evidenced by that agreement.
In its answer to the “Bill To Interplead Funds,” AmSouth asserted that Forestry’s indebtedness to AmSouth exceeded $324,-000. AmSouth then stated that, based *1354 upon Forestry’s allegations that the security agreement gave Orix a security interest only in the two pieces of equipment listed on Schedule A of the security agreement “package” of documents, and based upon the fact that neither of these pieces of equipment was part of the inventory sold at the auction of Forestry assets, AmSouth was entitled to the auction proceeds by virtue of AmSouth’s February 6, 1990, perfected security interest in all of Forestry’s assets. AmSouth also alleged that Orix’s “federal judgment” claim against the auction proceeds was inferior to AmSouth’s perfected security interest.
After a nonjury trial, the court entered a judgment in favor of Orix, holding that Orix was entitled to all of the interpleaded funds and that AmSouth was not entitled to any of those funds. The trial court also held for Orix on Forestry’s cross-claim, thus declining to reform the security agreement or to award damages to Forestry for the alleged fraud of Orix.
Forestry makes two arguments for reformation — the first regarding a question of fact, and the second regarding a question of law. Forestry first argues that, because of Forestry’s mistaken belief regarding its terms, Forestry executed a security agreement that did not express Forestry’s true intentions; therefore, Forestry concludes, it is entitled to reformation pursuant to Ala.Code 1975, § 35-4-154:
“When, through fraud, or a mutual mistake of the parties, or a mistake of one party which the other at the time knew or suspected, a deed, mortgage or other conveyance does not truly express the intention of the parties, it may be revised by a court on the application of the party aggrieved so as to express that intention, insofar as this can be done without prejudice to rights acquired by third persons in good faith and for value.”
Forestry maintains that, when the security agreement was executed, Orix knew or suspected that Forestry was not aware of the change in Orix’s financing arrangement with Forestry. Forestry says Orix knew Forestry was ignorant of the change, because, Forestry alleges, Orix had fraudulently suppressed the fact that a change had been made in its financing procedure. Further, argues Forestry, Orix allowed Forestry to proceed under a mistaken belief that no changes had occurred, thereby causing Forestry to execute financing documents that did not express Forestry’s true intentions. Forestry also claims “mistake” in executing the security agreement because it says it relied upon a “twenty-year pattern, practice, custom, and agreement” between Forestry and Orix, not realizing that this particular set of documents did not follow that “pattern.”
Forestry’s second argument in support of its request for reformation is that the “description of the collateral” portion of the financing statement, including both the specific description of the two pieces of equipment in Schedule A and the “dragnet” or “omnibus” clause in the first paragraph of the security agreement document itself, created an ambiguity that required judicial interpretation and reformation.
When, as in this case, a trial court hears disputed evidence without a jury and, based on that evidence, makes findings of fact, this Court assumes those findings to be correct and does not disturb them unless they are “clearly erroneous, palpably wrong, or manifestly unjust.” White v. Maryland Casualty Co., 589 So.2d 1294, 1296 (Ala.1991). Although the trial court here did not set out findings of fact or conclusions of law, this Court assumes that the trial court made those findings necessary to support its judgment, unless those findings are without supporting evidence. Knox Kershaw, Inc. v. Kershaw, 552 So.2d 126 (Ala.1989). We have carefully reviewed the arguments of the parties and the evidence of record, and we conclude that the trial court could reasonably have made those factual findings necessary to support the judgment.
The evidence supports the trial court’s refusal to reform the security agreement on the basis of “mistake.” There was disputed evidence as to whether this was the first time Forestry had been unable to sell a piece of repossessed equip *1355 ment and had been told by Orbe that the entire balance was due. There was also conflicting testimony as to whether Orix had notified Forestry of a need for a change in financing. This Court will not reverse a judgment entered by a trial judge who has heard disputed factual testimony and whose judgment is supported by the reasonable inferences from the evidence. White v. Maryland Casualty Co., supra.
Similarly, Forestry’s argument for reformation based on its reliance on a “pattern” of dealing with Orix is not supported by the evidence. The documentary evidence submitted by Forestry to prove a “pattern” of dealing with Orix consisted of UCC-1 financing statements and the supporting “letter of trust” documents issued by Forestry to Orix. None of these documents contains the language of the security agreement documents now contested by Forestry.
Until the documents in issue were executed, Forestry’s “twenty-year pattern, practice, custom, and agreement” with Orix regarding financing had never required Forestry 1) to execute a UCC-1 financing statement that gave Orix an interest in “all” the debtor’s machinery, etc., or that referenced an attached security agreement; 2) to execute and attach a security agreement to a UCC-1 financing statement; 3) to execute a stockholders’ consent form or a secretary’s certificate showing the directors’ consent to a financing arrangement; or 4) to obtain notarization of the signatures on the financing documents. Indeed, the prior UCC-1 forms specifically stated that they were being filed “for notification purposes only, as [Forestry] is a bailee of goods, inventory and equipment for [Orix].”
Despite its never having followed this procedure before in dealing with Orix, Forestry executed all of the documents Orix submitted to Forestry as part of the financing in issue here and returned them to Orix. Too, DeGrave testified that he told Hester about the documents that would have to be executed and that DeGrave assumed, when the executed documents were returned to Orix, that Forestry understood the documents and their significance.
The unique requirements that Orix imposed upon Forestry in executing the security agreement are sufficient evidence of notice of a change in any financing “pattern” that may have developed between Forestry and Orix over the years. Any reliance by Forestry on that pattern in executing the documents in issue here was simply misplaced, not the result of such a “mistake” as would support reformation.
Additionally, the evidence that the security agreement was fully executed by Jack Hale and Charles Hale and that their signatures were notarized where notarization was required was not disputed. “[B]e-tween debtor and creditor, a security agreement is effective according to its terms under [Ala.Code 1975,] § 7-9-201, if the provisions of § 7-9-203 and § 7-9-204 are met.” Waters v. Union Bank of Repton, 370 So.2d 957, 961 (Ala.1979). Forestry does not argue that the provisions of §§ 7-9-203 and -204 were not met by the execution of the security agreement here; therefore, the security agreement “is effective according to its terms.”
Turning to Forestry’s “ambiguity” issue, we first note the following:
“Clearly, the degree of specificity required of a given description is, in part, a function of the factual context in which the documents were executed. The description . requirement is evidentiary. The description in a security agreement or financing statement is sufficient if it serves its intended purpose_ The description in the financing statement is sufficient if it serves to put others on notice of the secured party’s claim.”
First National Bank of Franklin County, Tennessee v. Smith, 447 So.2d 705, 708 (Ala.1984).
“Alabama has adopted the provisions of the Uniform Commercial Code covering secured transactions_ Section 7-9-402 deals with the formal requirements of a financing statement that secures a creditor’s interest in a debtor’s property_ The official comments explain that section 7-9-402 adopts a sys *1356 tem of notice filing_ Thus, the sufficiency of a description in a financing statement is measured in terms of notice to third parties of the secured party’s claim.”
Leasing Service Corp. v. Hobbs Equipment Co., 894 F.2d 1287, 1290 (11th Cir. 1990).
Contrary to the previous UCC-1 financing statements executed to evidence Forestry’s debts to Orix, the financing statement in issue here clearly states that it covers “all” of Forestry’s “machinery, inventory, equipment, goods and accounts receivable as described in attached entire agreement.” It goes on to provide that this particular financing statement is submitted “with the attached security agreement and/or schedule” and that this package of documents was filed “as a financing statement.” We believe that, among parties as familiar with financing as the parties to this appeal were, there is no question that the security agreement documents in issue here create a valid, unambiguous security interest in favor of Orix and provide a clear basis for notice to third parties of just what that security interest covered.
We agree with the trial court that the law in Alabama, as applied to the facts of this case, does not entitle Forestry to a reformation of the security agreement based on its argument of “ambiguity.” We find nothing in the record to require a different interpretation of the security agreement than that given it by the trial court.
Applying the controlling portions of Alabama’s Uniform Commercial Code and the law regarding “reformation of instruments,” and giving due deference to the trial court’s findings of fact, we affirm the judgment.
AFFIRMED.
HORNSBY, C.J., and ALMON, ADAMS, STEAGALL and INGRAM, JJ„ concur.

. AmSouth’s entire argument to this Court consisted of its statement that its brief was being filed solely to protect AmSouth’s security interest in the interpleaded funds. AmSouth’s ultimate position is that "if Forestry Equipment is successful in its appeal [i.e., if Orix’s security interest is held invalid], AmSouth is entitled to all of the proceeds from the auction described in the brief of Appellant Forestry Equipment.” Thus, we shall treat Forestry as the principal appellant.

. The documents that are part of this particular financing arrangement (UCC-1 financing statement, Schedule A, security agreement, secretary's certificate, and consent of stockholders) were signed on several different dates. However, because the terms of the security agreement are the provisions in issue here, and because the date of filing with the secretary of state determines when a security interest is perfected, we will refer to this entire package of financing documents as "the security agreement.”

. The pleading was a third-party complaint only to the extent that it sought relief against fictitiously named defendants. No parties were substituted for those fictitiously named defendants, so we will refer to this pleading simply as a cross-claim against Orix.